# Illinois Official Reports

## Appellate Court

---

**People v. Williams, 2020 IL App (1st) 163417**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JEFFREY WILLIAMS, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>No. 1-16-3417 |
| Filed | February 20, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 15-CR-6620; the Hon. Thaddeus L. Wilson, Judge, presiding. |
| Judgment | Affirmed and remanded. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Ashlee Johnson, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, John E. Nowak, and Noah Montague, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.<br>Justices Lampkin and Reyes concurred in the judgment and opinion. |

**OPINION**

¶ 1       After a jury trial, defendant Jeffrey Williams was convicted of one count of being an armed habitual criminal and sentenced to 14 years with the Illinois Department of Corrections (IDOC).

¶ 2       Defendant's conviction was based on his possession of a firearm after having been previously convicted of burglary and the manufacture or delivery of a controlled substance. Since the parties stipulated at trial that he had been convicted of two qualifying offenses, the issue at trial concerned the element of possession. On appeal, defendant claims that the State engaged in prosecutorial misconduct when it argued that defendant's decision to go to trial amounted to a refusal to take responsibility for his actions, as compared to his codefendant who had pled guilty. Defendant acknowledges that he forfeited this claim for appellate review and asks us to review it under the plain error doctrine. For reasons explained below, we do not find that this error rises to the level of plain error and affirm.

¶ 3       In his initial brief, defendant also raised fines-and-fees issues, but he concedes in his reply brief that we lack the authority to review them. Pursuant to the newly revised Illinois Supreme Court Rule 472(e) (eff. May 17, 2019) and for reasons explained below, we remand the fines-and-fees claims to the trial court in order to permit defendant to file a motion in that court, if he chooses to do so.

¶ 4                                                      BACKGROUND

¶ 5       The case at bar stemmed from the accidental shooting of a child by another child, and the central issue was whether defendant possessed the gun used in the accidental shooting. At trial, the State called as event witnesses (1) the injured child, (2) his sister, and (3) their mother. We provide below the details of what each event witness testified to because defendant's case consisted largely of establishing inconsistencies between their trial testimony and their prior statements and inconsistencies among their individual trial testimonies.

¶ 6       At trial, T.H., 10 years old, testified that on April 7, 2015, he was 8 years old and living in a third-floor apartment with his mother, his sister, and defendant. His sister slept in her own room, while T.H. slept in his mother's room. Defendant did not sleep over every night, but when he did, he slept in the mother's room. On the night of April 6, 2015, T.H. had a friend, Antonio,[1] sleep over and they slept in the front room. Defendant also spent the night of April 6 in the apartment. On the morning of April 7, 2015, T.H., Antonio, defendant, and T.H.'s sister and mother were all present in the mother's room, when the mother "told [defendant] to get the gun out of the house." After the defense objected, the prosecutor explained that the State was not admitting her statement for the truth of the matter asserted but to explain later actions. After the trial court overruled the objection, T.H. testified that defendant removed a gun from under the bed, wrapped it in one of T.H.'s shirts, and walked toward the kitchen. While T.H. did not observe defendant either enter or exit the kitchen, T.H. did hear the back door[2] close.

_____

[1]On cross-examination, T.H. testified that his friend Antonio was nine years old at the time of the shooting.

[2]Subsequent testimony established that the back door was by the kitchen.

¶ 7    T.H. testified that, after defendant exited the apartment, T.H. and Antonio were playing basketball in the house, and T.H.'s mother and sister departed to go to a store. While T.H. stood by the bedroom door, Antonio entered the bedroom and looked under the bed, and both boys observed a gun under the bed. Then Antonio walked to the kitchen, followed by T.H., who asked Antonio what he was doing. Antonio climbed on top of the counter, and so did T.H. Antonio grabbed the gun from above the refrigerator and descended from the counter with it. At that moment, T.H. was still on the counter, and Antonio was below him. Antonio pulled the trigger once, and nothing happened, so he pulled the trigger again. This time the gun fired a shot, which hit T.H. in the stomach and then traveled through the cabinet. T.H. testified that, after the gun fired, Antonio placed it on the counter, gathered his things, and left the house. T.H. wiped off some of the blood with a tissue, changed his clothes, and retrieved the shell discharged by the gun.

¶ 8    T.H. testified that he threw the shell from the balcony at the back of the apartment. When his mother and sister returned, he opened the door for them. They told him to put on his shoes, which he did, and they all left the apartment together. Once outside, they ran into defendant, who hollered at T.H.: " 'Why did you touch the gun?' " After T.H. replied that he had not touched the gun, defendant started crying and dropped to his knees. Defendant then walked back toward the apartment. T.H., his mother, and his sister met T.H.'s cousin "Tone Tone," as well as a friend. The friend's mother then transported T.H. and his mother, sister, and cousin Tone Tone to the hospital.

¶ 9    T.H. testified that, while they were in the vehicle heading to the hospital, his mother told him to lie and to say that he was shot outside. When he arrived at the hospital and met with nurses and doctors, that is what he told them. T.H. explained that he lied "so my mama wouldn't go away." After T.H. finished speaking with a police detective, his grandmother arrived at the hospital. After having a conversation with his grandmother about telling the truth, T.H. spoke to the detectives again and told them what had really happened.

¶ 10    On cross-examination, T.H. testified as follows. On the night of April 6, 2015, defendant slept with T.H.'s mother in the mother's bedroom. When T.H. woke up on April 7, 2015, it was light out, defendant was talking to T.H.'s mother in her room, and T.H. walked into her room. Later, T.H. told Detective Nathaniel that T.H. observed defendant "walk in" with a gun and a shirt. The testimony did not specify whether defendant was walking into a specific room or the apartment as a whole. Although Antonio and T.H. observed a gun under the bed, they did not remove it from there. When they observed a gun above the refrigerator, it was not wrapped in a shirt. When T.H. observed defendant walk toward the kitchen, the gun was wrapped in a short-sleeved black shirt. The next time that T.H. observed the shirt, the shirt was "in the window."

¶ 11    T.H. and his family moved into the apartment a month before the shooting. On April 7, 2015, his mother and sister departed the apartment for the store only a few minutes after defendant had left. After the shooting, Antonio took his things and ran out of the apartment, but Antonio left his basketball and his rim. After his mother returned, they exited the third-floor apartment, walked down the stairs, went across the street, and observed defendant by the gas station. His mother started yelling at defendant, and they began arguing. Then defendant started yelling at T.H. " 'Why [did] you touch the gun?' " Defendant fell to his knees and started crying.

¶ 12    T.H. did not know defendant prior to moving to the new apartment, but defendant knew T.H.'s uncles. During the ride to the hospital, his mother told him to say that he was outside when the shooting occurred and that some boy was shooting. She told him to say this "[s]o she won't go away." T.H. did not want her to go away; he loves her, and he does what she tells him to do, so when she told him not to tell the truth, he did not tell the truth. When T.H. arrived at the hospital, he told the doctors, nurses, and police that he had been shot outside because his mother had told him to.

¶ 13    Finally, on cross-examination, T.H. testified that, when he observed the gun in the kitchen, it was above the cabinets that, in turn, were above the refrigerator. After the shooting, Antonio placed the gun on the counter. When T.H. was at the hospital, the police took his mother, and he did not see her again for a while. After his mother was arrested, he started living with his grandmother, with whom he was still living at the time of trial.

¶ 14    T.H.'s sister, D.B., testified that she was 13 years old and in the eighth grade at the time of trial. On April 7, 2015, she lived with her brother and mother, and she knew defendant as a friend of her uncle. On April 7, 2015, defendant arrived at their apartment when D.B. had just woken up. Her mother, her brother, and her brother's friend Antonio were already there. Normally, her brother slept in her mother's bedroom, and D.B. slept in her own room. But, on the night of April 6, T.H. and his friend Antonio slept in the front room. After defendant arrived at the apartment on April 7, defendant asked D.B.'s mother for "the gun" and told her that "he was gonna get into it with somebody." When defendant made this statement, defendant, D.B., T.H., and their mother were all in the mother's room, while Antonio was outside of the room. In response, their mother retrieved a gun from under the bed, wrapped it in a shirt, and gave it to defendant, who walked out of the bedroom, toward the kitchen.

¶ 15    D.B. testified that, after defendant walked out of the bedroom, D.B. started putting on her shoes because her mother told her they were going to the store. When D.B. and her mother exited the apartment, T.H. and Antonio were still at home. As D.B. and her mother were walking back home from the store, they observed Antonio running toward his house but, when he noticed them, he ran toward them and told them that T.H. had been shot. When D.B. and her mother arrived back home, T.H. had his hand on his stomach with tissue and he was crying. When they asked him what happened, at first he said, " 'Nothing.' " But when their mother asked again, he lifted up his shirt and showed her the bullet wound. The three of them went outside, where they encountered their cousin Tone Tone and told him what happened. Then they walked toward defendant and told him what happened. After hearing that T.H. was shot, defendant started yelling at T.H. and asking why T.H. was playing with the gun. T.H. was crying and saying that he was not playing with it, Antonio was. Then they met a friend, who transported them to the hospital. D.B. did not observe where defendant went after she entered the vehicle.

¶ 16    On cross-examination, D.B. testified that defendant did not sleep over that night, which was contrary to her brother's testimony. The first time D.B. observed defendant that day was when she woke up and he entered the apartment. At some point, D.B. spoke with some detectives at her grandmother's house, but D.B. did not tell them about the conversation between her mother and defendant concerning a gun. D.B. and her mother exited the apartment "a few minutes after [defendant] left." D.B. did not recall whether she had told the detectives that they had all exited together or that she had observed a gun. At trial, she did not recall the color of the shirt that the gun was wrapped in.

¶ 17        D.B. testified next that she told the detectives the truth about what happened, that she told them that she had observed the gun wrapped in a shirt, and that she told them that her grandmother had given "them" the gun. D.B. testified that, before she went to her own room to put on her shoes, she observed defendant entering the kitchen. However, she did not observe what he did in the kitchen. When D.B. and her mother left the apartment, they exited the front door. The back door is in the kitchen. The store that she and her mother went to was a small convenience store, but not the mini-mart in the gas station. After they found out that T.H. had been shot, D.B. did not observe her mother hand anything to defendant.

¶ 18        D.B. testified that she spoke at her grandmother's house with a Mr. Redmond from the Department of Children and Family Services (DCFS) but on a different day than the day she spoke with the detectives. D.B. denied telling Redmond that her mother had given defendant the house keys in order to clear the gun out of the house. D.B. did not recall observing her mother hand defendant the house keys and did not recall hearing her mother tell defendant to remove the gun. D.B. overheard her brother tell their grandmother that the gun was "over" the refrigerator. When D.B. and her mother went to the store, her mother purchased liquor. After defendant heard that her brother was shot, defendant fell to his knees, "still yelling" at T.H. D.B. did not recall whether she told the detectives that defendant asked for his gun. D.B. was not really sure who was a detective and who was a police officer. She recalled talking to police officers in uniform at her grandmother's house. However, she did not recall talking to any officers without uniforms. Officers did not talk to her at the hospital when they took her mother away, and they did not take D.B. at that time. At her grandmother's house, D.B. recalled speaking one time to the police and also speaking to a man from DCFS.

¶ 19        D.B. testified that her mother's friend drove D.B., T.H., their mother, and their cousin Tone Tone to the hospital. During the trip to the hospital, their mother told both T.H. and D.B. to say that T.H. was outside when he was shot, but D.B. never had an opportunity to say that because no one asked her.

¶ 20        M.B.,[3] age 33, testified that she was living with her grandfather and working in a factory at the time of trial. She had a 2003 conviction for forgery and a gun conviction from this case for which she was sentenced to 2½ years with IDOC. On April 7, 2015, she was living with her two children, T.H. and D.B. M.B. and defendant had grown up together, and he was her boyfriend at the time of the shooting. On the morning of April 7, 2015, she was at home with her two children and her son's friend Antonio when she received a phone call from defendant. Defendant asked her to retrieve a weapon because he "had gotten into it with somebody," and he was coming over for it. M.B. retrieved a gun from under the bed in her room, wrapped it in her son's shirt, and walked to the back door as defendant was coming up the stairs. She opened the door for him and handed him the gun. When defendant entered the apartment, he was "still going off" about how "he was into it with somebody." M.B. told him "to calm down and go put that gun up" before he did something stupid in broad daylight. Although she asked him to take the gun out of the house, he did not leave right away. She asked him for some money so that she could go to the store. He gave her the money, and before she went to the store, she went to the bathroom. When she headed to the bathroom, defendant was standing by the back door. D.B. wanted to go to the store, but T.H. and Antonio did not want to go, so M.B. sat the two boys down in her room and told them to watch television until she returned. Defendant,

        [3]We refer to the mother by initials since she shares a last name with her underage daughter.

M.B., and D.B. all left the apartment together. M.B. and D.B. went to the store while defendant went his own way.

¶ 21 M.B. testified that, after purchasing alcohol at the store, she and D.B. were walking back home when they observed Antonio running toward his house. M.B. yelled his name, and Antonio ran up to her and told her that T.H. was shot. When M.B. arrived at her back door, T.H. opened it for her. T.H. held a tissue covering a wound, and he told her that Antonio had shot him by mistake. When M.B. examined the wound, it looked to her like "just a skin mark," so they exited the apartment and walked to the corner where her cousin Tone Tone was, and he looked at it. Then they met defendant. When M.B. told him what happened, defendant started yelling at T.H., asking T.H. why he "touched" the gun. T.H. responded that he did not touch it; Antonio did. Tone Tone examined the wound again and concluded that the wound was "not a skin mark" and that the shot had traveled through T.H. M.B. tried to call 911, but her phone "dropped," and a friend pulled up in a vehicle. The friend transported M.B., D.B., T.H., and Tone Tone to the hospital. Before entering her friend's vehicle, M.B. gave defendant her house keys. During the trip to the hospital, M.B. "ma[d]e up this story" that T.H. had been shot outside. At the hospital, M.B. told the police that T.H. was shot outside, that "they" were playing basketball in the alley, and that "they was driving by shooting."

¶ 22 M.B. testified that, while she was at the hospital, she received a phone call from defendant who asked her how T.H. was doing, and he sounded concerned. M.B. told him "that they were supposed to have pictures of us," and defendant replied that "if he had to turn his self in he will." The police then removed her from the room with her son because they had been to the apartment building and learned that T.H. had been shot in the apartment. M.B. was taken to another room, where the police kept telling her to tell the truth, but she stuck to the same story. At some point, she did tell them the truth, which is what she testified to at trial. M.B. did not own a gun and did not keep guns in the house.

¶ 23 On cross-examination, M.B. testified as follows. M.B. did know the gun was in her house. At 9 a.m. or 9:30 a.m., M.B. took her daughter with her to a liquor store to purchase vodka with the money defendant had given her. Defendant did not live in the apartment, but he stayed there occasionally, and he stayed there the night before the shooting. When defendant arrived the night before at the apartment, M.B. did not observe the gun and she did not know it was there. Defendant left the apartment early in the morning before either she or the kids were awake and then returned. When he told her that he "got into it" with someone, she understood that to mean he had had an argument or fight with someone. M.B. woke up when defendant called her phone.

¶ 24 M.B. testified that, when she first spoke to the police, she told them that T.H. was shot outside because she was a convicted felon and she knew possessing a gun was a crime. Also, the apartment was in a Chicago Housing Authority building, and she could be evicted for possessing a gun. When M.B. was at the hospital, the police transported her to a police station. Although they did not advise her of her *Miranda* rights, she spoke with them. At some point she decided to tell them the truth. M.B. did not recall telling the police that she observed defendant in possession of another handgun sticking out of his back pocket. Both the night before the shooting and the morning of the shooting, M.B. had been drinking vodka. Defendant did not have his own keys to the apartment, but she "always gave him [her] keys when [she] went outside," so defendant "had [her] keys." However, she did tell the police that defendant had his own keys and was the only other person who had keys to her apartment. M.B.

explained: "it was like they was [*sic*] his keys because he had my keys all the time." When M.B. wanted to enter the apartment, she would retrieve the keys from defendant or he would come to the apartment to let her in.

¶ 25 M.B. testified that defendant told her that he was coming for his gun, but she could not remember whether he had a gun sticking out of his pocket when he arrived. The shirt that she wrapped the gun in was a short-sleeved "colorful" shirt. When she was in jail, she called George Redmond from DCFS and told him that she never touched the gun and that she did not like guns. M.B. explained that she did not touch the gun but rather she wrapped it in the shirt. In the ride to the hospital, she did not tell T.H. to lie; rather, she told Tone Tone what she was going to say and her "son went off what [she] said." Similarly, she did not tell D.B. what to say, and she did not think that T.H. and D.B. would repeat the story she was making up. M.B. thought that she would tell the police that T.H. was shot outside, while T.H. would say the truth, namely, that he was shot in the apartment. M.B. made up the story about T.H. being shot outside in order to protect herself, not defendant.

¶ 26 M.B. testified that, when defendant returned to the apartment for the gun, she handed him the gun "by the kitchen." M.B. retrieved the gun from the bedroom because he called and told her it was there. Before his phone call, she did not know the gun was there. After she handed him the gun wrapped in the shirt, he removed the gun from the shirt and held it while "he was going off about he got into it with somebody." M.B. told defendant to "put [the gun] up" because she did not want him to shoot anybody with it. Defendant left the apartment with M.B., and she did not observe him with the gun when they left. Prior to leaving, she went to the bathroom first, and she did not observe what he did while she was in the bathroom. When she exited the bathroom, defendant was near the back door, by the kitchen.

¶ 27 Detective Carlton Flagg, with the Chicago Police Department, testified that on April 7, 2015, he went to a third-floor apartment to investigate the shooting, and he identified certain photos in court as accurately depicting the apartment the way it appeared on that day. After speaking with T.H. at the hospital with T.H.'s grandmother present, Detective Flagg returned to the building and searched the backyard, finding one spent .45-caliber shell.

¶ 28 On cross-examination, Detective Flagg testified that he was working that day with Detective Allen Nathaniel, and they interviewed T.H. A summary of their interview was memorialized in a report. Although a summary, it would contain any relevant or important information. Nowhere in the report does it say that T.H. observed defendant walk from the bedroom to the kitchen with a gun. The police report of the interview states that T.H. had previously observed a gun, but it does not state that T.H. observed the gun under the bed that day. Detective Flagg also interviewed M.B. at a police station after reading her rights to her. The report also states that M.B. observed defendant in possession of another handgun sticking out of his back pocket when he reentered the apartment and that M.B. told them that defendant was the only other person who had keys to her apartment.

¶ 29 Detective Ronnie Lewis, with the Chicago Police Department, testified that on April 7, 2015, he secured the crime scene at the third-floor apartment and recovered a live .45-caliber round from inside a cabinet, above a refrigerator.

¶ 30 Officer John Sandoval, with the Chicago Police Department, testified that on April 11, 2015, he was in civilian dress but wearing a star around his neck, an outer bulletproof vest, and

a gun belt around his waist. He was on patrol with Officer Fietko[4] in a Ford Explorer that had no decals but had M plates outside and a computer, lights, and sirens inside. Sandoval was aware of an investigative alert for defendant when Sandoval observed defendant one block south and three-quarters of a block from where the shooting had occurred. Sandoval, who was driving, pulled the Ford Explorer alongside defendant, while his partner asked defendant for his name. Defendant looked in their direction and fled. His partner followed on foot, while Sandoval followed in the vehicle, with both officers directing defendant to stop. Eventually, defendant was detained and taken into custody. When processed, defendant provided a different address than the address of the shooting.

¶ 31 The parties stipulated concerning the two qualifying felonies, and the State rested. The defense moved for a directed verdict, which was denied, and defendant exercised his right not to present evidence. During jury instructions, the jury was instructed on both actual and constructive possession, as well as joint possession. After listening to jury instructions and closing arguments and deliberating for an hour and a half, the jury found defendant guilty of being an armed habitual criminal.

¶ 32 After denying defendant's posttrial motion for a new trial, the trial court considered factors in mitigation and aggravation, including his nine prior felony convictions, and sentenced him to 14 years with IDOC. The trial court also denied his motion to reconsider sentence. A timely notice of appeal was filed, and this appeal followed.

¶ 33                                      ANALYSIS
¶ 34                              I. Plain Error Doctrine
¶ 35 Defendant argues that the State committed prosecutorial misconduct through its remarks in both its opening statement and closing argument, but he acknowledges that he forfeited this claim for review.

¶ 36 To preserve a purported error for consideration by a reviewing court, a defendant must both (1) object to the error at trial and (2) raise the error in a posttrial motion. *People v. Sebby*, 2017 IL 119445, ¶ 48. "Failure to do either results in forfeiture." *Sebby*, 2017 IL 119445, ¶ 48. Defendant concedes that, since he did not include prosecutorial misconduct in his posttrial motion for a new trial, his claim of prosecutorial misconduct is forfeited for our review.

¶ 37 However, the plain error doctrine permits a reviewing court to consider an unpreserved claim (1) if a clear or obvious error occurred and the evidence is so closely balanced that this error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) if a clear or obvious error occurred and this error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence at defendant's trial. *Sebby*, 2017 IL 119445, ¶ 48; *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Defendant asks us to consider his claim under both prongs.

¶ 38 In a plain error analysis, it is the defendant who bears the burden of persuasion. *Sebby*, 2017 IL 119445, ¶ 51. The first step under either prong of the plain error doctrine is to determine whether there was an error at trial and whether this error was clear or obvious. *Sebby*, 2017 IL 119445, ¶ 49; *Piatkowski*, 225 Ill. 2d at 565. In addition, we may affirm on any basis

---

[4]No first name was provided for Officer Fietko.

found in the record. *People v. Begay*, 2018 IL App (1st) 150446, ¶ 35; *People v. Daniel*, 2013 IL App (1st) 111876, ¶ 37 ("we may affirm on any basis appearing in the record, whether or not the trial court relied on that basis or its reasoning was correct").

### II. Standard of Review

While the State has wide latitude in both its opening statements and closing arguments and may comment on the evidence, it is still improper for the State to make comments that have no other purpose than to arouse the prejudices and passions of the jury. *People v. Jones*, 2016 IL App (1st) 141008, ¶ 21; *People v. Herndon*, 2015 IL App (1st) 123375, ¶ 36 ("[i]t is improper for a prosecutor to make comments irrelevant to the question of guilt or innocence and that only serve to inflame the jury's passions"); *People v. Schneider*, 375 Ill. App. 3d 734, 755 (2007) ("the prosecutor's exhortations" to the jury to "have some compassion for the victim" were improper). Even if the remarks were inappropriate, reversal is required only if they engendered such substantial prejudice against the defendant that it is impossible to tell whether the verdict of guilt resulted from them. *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007); *People v. Johnson*, 119 Ill. 2d 119, 139-40 (1987); *Jones*, 2016 IL App (1st) 141008, ¶ 23. If the reviewing court cannot say whether the prosecutor's improper remarks contributed to the defendant's conviction, then it must grant a new trial. *Wheeler*, 226 Ill. 2d at 123; *Jones*, 2016 IL App (1st) 141008, ¶ 23.

Defendant acknowledges that this court has applied, in different cases, both a *de novo* standard and an abuse-of-discretion standard when reviewing a prosecutor's opening statement. Compare, *e.g.*, *People v. Deloney*, 359 Ill. App. 3d 458, 470 (2005) ("generally left to the circuit court's discretion"), with *Jones*, 2016 IL App (1st) 141008, ¶ 23 ("*de novo*"). In support, both *Deloney* and *Jones* cite cases[5] that reviewed closing arguments and, thus, reflect the long-standing confusion that this court has often noted concerning the appropriate standard of review to be applied to closing arguments. See *People v. Boston*, 2018 IL App (1st) 140369, ¶ 82; *People v. Johnson*, 2015 IL App (1st) 123249, ¶ 39 ("[t]his court has noted confusion regarding the appropriate standard of review regarding alleged errors occurring during closing arguments"); *People v. Johnson*, 385 Ill. App. 3d 585, 603 (2008) ("Since *Wheeler*, appellate courts have been divided regarding the appropriate standard of review.").

In the case at bar we need not resolve this dispute with respect to either opening statements or closing arguments because the outcome would be the same under either standard of review, as explained below.

### III. Clear and Obvious Error

Defendant argues, among other things, that the State's references to defendant's failure to take "responsibility" constituted a clear and obvious error. The State responds that it is "*not* arguing that its remarks in closing *** did *not* improperly implicate defendant's exercise of his right to go to trial." (Emphases added.) With a double negative, the two "not[s]" generally cancel each other out. See *People v. Bannister*, 232 Ill. 2d 52, 85-86 (2008); *Examples of*

---

[5]*Jones*, 2016 IL App (1st) 141008, ¶ 23, cites *Wheeler*, 226 Ill. 2d at 121 (discussing "II. Propriety of the Prosecutor's Closing Argument"), while *Deloney*, 359 Ill. App. 3d at 470, cites *People v. Ellis*, 315 Ill. App. 3d 1108, 1121 (2000) ("closing argument [is] left largely to the circuit court's discretion"), and *People v. Kirchner*, 194 Ill. 2d 502, 549 (2000) (discussing closing argument).

*Double Negatives*, YourDictionary.com, https://examples.yourdictionary.com/examples-of-double-negatives.html (last visited Feb. 4, 2020) [https://perma.cc/E57A-2V9F] ("simplify sentences like these by replacing the double negative with a positive"). If one removes the double negative, the State is "arguing that its remarks in closing *** did *** improperly implicate defendant's exercise of his right to go to trial." We agree with the State that its remarks improperly implicated defendant's exercise of his right to go to trial.

¶ 45    In the State's opening statement, the prosecutor made "responsibility" the theme of its statement, starting with a quote from Eleanor Roosevelt that a person is responsible for the choices that he or she makes. The State argued that, after the shooting, "defendant doesn't take responsibility for the fact that he left a loaded gun in a house" with children and, instead, defendant yelled at one of the children. The State emphasized that, while M.B. was at the hospital with her injured son, defendant called her and stated that he was going to take responsibility, "[b]ut he doesn't. He doesn't turn himself in." In the next sentence, the prosecutor contrasted defendant's actions with those of M.B, who "takes responsibility." "She talks to the police; she tells them what happened. In fact, she pleads guilty to having that gun in her house ***." After observing that M.B. pled guilty, the prosecutor asked: "Who doesn't take responsibility even then? The defendant."[6] By contrasting defendant's actions of not "turn[ing] himself in" and not pleading guilty with M.B.'s actions of "talk[ing] to the police" and pleading guilty, the prosecutor was criticizing defendant's invocation of his constitutional rights to remain silent and go to trial.

¶ 46    If the remarks in the State's opening statement left any doubt in the jury's minds whether the State was referring to defendant's choice not to plead guilty, that doubt was erased by the State's opening line in its closing argument: "Members of the jury, for the last year and a half this [d]efendant has been running from the responsibility *he should be taking* for his actions on April 7, 2015." (Emphasis added.) The State argued that defendant was "running from the fact" that he was guilty of being an armed habitual criminal. Defense counsel objected "to the running," and the trial court ruled: "All right. You have made your point. Move on. Sustained." While a trial court's action of sustaining an objection and offering curative remarks will often ameliorate an error,[7] in the case at bar the trial court's ruling was directed at the prosecutor's *continuing* in the same vein. The court's words did not indicate that the prosecutor had erred in making this "point"; rather, the error, as indicated by the trial court, was in belaboring the point—hence, the instruction to "[m]ove on."

¶ 47    However, immediately after receiving that instruction from the trial court, the prosecutor still continued, telling the jurors that it was "time" for them "to tell" defendant: "It's time for you to take responsibility for your actions." These words further equated his "responsibility" with accepting guilt.

---

[6]Next, instead of arguing that defendant's subsequent flight from police was consciousness of a guilty mind, the State argued that defendant's flight from police represented defendant's "running from responsibility."

[7]"Although a defendant is entitled to a trial free of improper comments, not every improper question or comment requires reversal. Instead, ' "the act of promptly sustaining the objection and instructing the jury to disregard such argument has usually been viewed as sufficient to cure any prejudice." ' " *People v. Ramsey*, 239 Ill. 2d 342, 438 (2010) (quoting *People v. Childress*, 158 Ill. 2d 275, 298 (1994), quoting *People v. Baptist*, 76 Ill. 2d 19, 30 (1979)).

¶ 48 Both sides cite *People v. Libberton*, 346 Ill. App. 3d 912 (2003). In *Libberton*, the prosecutor asserted that defendants routinely " 'plead guilty.' " *Libberton*, 346 Ill. App. 3d at 917. The prosecutor argued: " 'It happens every day. You hear about it all the time.' " *Libberton*, 346 Ill. App. 3d at 917. A defendant has second thoughts and says to himself: " ' "You know what? That story I gave was pretty stupid and I think it's time for me to accept responsibility ***." ' " *Libberton*, 346 Ill. App. 3d at 917.

¶ 49 While the appellate court in *Libberton* wrote a majority opinion, as well as a supplemental opinion on rehearing, a special concurrence, and a dissent, all three justices on the panel agreed that these remarks by the prosecutor were improper.[8] The *Libberton* court found: "The State made comments which suggest, essentially, that a decent person in defendant's position would have pleaded guilty. Negative comments about a defendant's exercise of his or her constitutional rights are improper because they penalize the defendant for the exercise of those rights." *Libberton*, 346 Ill. App. 3d at 923. Similarly, in the case at bar, the prosecutor made comments suggesting that a decent person in defendant's position would have pleaded guilty— as his codefendant, in fact, did. The prosecutor's comments penalized defendant for not, in essence, following her good example. See, *e.g.*, *People v. Mayden*, 71 Ill. App. 3d 442, 444-45 (1979) ("Evidence that an accomplice has been separately convicted or has pleaded guilty to the same offense as defendant is generally inadmissible."). As a result, we find that the prosecutor's remarks were a clear and obvious error.

¶ 50 In addition, the *Libberton* court found the remarks before it improper, although acknowledging that the prosecutor's remarks "concerning defendant's choice to exercise his constitutional right to a jury trial constituted a miscalculated" and spontaneous, off-the-cuff "response to a remark by defense counsel." *Libberton*, 346 Ill. App. 3d at 938. By contrast, in the case at bar, the remarks at issue were part of "the prosecutor's well-orchestrated" and planned "argument," further establishing the clear and obvious nature of the error. *People v. Johnson*, 208 Ill. 2d 53, 76 (2003).

¶ 51                                    IV. Other Alleged Errors

¶ 52 Defendant also claims that the State's error in referring to defendant's failure to take responsibility was "compounded" by other improper remarks by the prosecutor. Defendant concedes that these other "remarks in isolation may have been small" but argues that, taken together with the State's error in referring to defendant's failure to take responsibility, they constituted "pervasive" conduct and, hence, clear or obvious error.

¶ 53 We have already found that the State's references to defendant's failure to take responsibility, by themselves, constituted clear or obvious error without needing to bolster this conclusion with these other comments. However, for the sake of completeness, we will discuss these other comments here.

¶ 54 First, defendant claims that the prosecutor misstated evidence in closing. At trial, T.H. and his sister testified that defendant asked T.H., after the incident, why T.H. had touched "the" gun. However, in closing argument, the prosecutor argued: "[T.H.] said: Why did you touch the gun. Why did you touch my gun." Later, the prosecutor argued that the jury should consider defendant's "reaction when he learned that [T.H.] got shot, it was not how did that happen. It

---

[8]The dispute among the *Libberton* justices concerned not whether the prosecutor's actions were improper but whether they were egregious enough to warrant a new trial, a subject that we discuss next.

was why were you [t]ouching my gun." Still later in closing, the prosecutor argued: "Three people saw and heard this [d]efendant yelling at eight-year old [T.H.] for touching his gun." On appeal, defendant claims that the prosecutor misstated the evidence by substituting the words "my" or "his" for "the." However, the prosecutor's use of "my" and "his" was clearly argument, drawing reasonable inferences from the testimony. The prosecutor was arguing that defendant was yelling at T.H. precisely because T.H. had touched *his* gun.

¶ 55    Defendant also claims that the prosecutor misstated the evidence in rebuttal closing when she argued that all three event witnesses "saw this [d]efendant in the kitchen with the gun." T.H. testified that he observed defendant walk toward the kitchen with the gun, and although T.H. did not observe defendant enter or exit the kitchen, he heard the slam of the back door, which exited from the kitchen. D.B. testified that she also observed defendant walk toward the kitchen with the gun. M.B. testified that she handed defendant the gun "by the kitchen." We do not believe that the difference between walking toward the kitchen and being in the kitchen is sufficient to be considered prejudicial.

¶ 56    Second, defendant claims that the State erred by asking M.B. on direct examination about her sentence for the conviction relating to the gun in this case:

> "Q. And you also have a conviction for a gun case as it relates to this matter, is that correct?
>
> A. Yes.
>
> Q. And you received two-and-a-half years in the [IDOC] for that gun case, is that correct?
>
> A. Yes."

On appeal, defendant claims that this testimony prejudiced defendant because the jurors might think he would receive only "a few years" in prison if convicted and that, if she served time, he should too. However, defense counsel did not object to this testimony, and defendant does not claim on appeal that the State argued this fact at any point during the rest of the trial. Again, any possible prejudice from this isolated statement was minimal.

¶ 57    Third, defendant claims that the prosecutor committed misconduct when he ended the State's initial closing argument by stating: "You [k]now he possessed a gun. Be responsible. Find him guilty. Thank you." Defendant argues that these remarks were prejudicial because they echoed the State's theme that defendant failed to take responsibility and suggested that the jurors would be complicit in defendant's failure to take responsibility if they did not find him guilty. We already found that this theme constituted a clear or obvious error, so to the extent that these remarks could be understood as echoing this same theme, they are prejudicial for the same reasons that do not need to be repeated again.

¶ 58    Fourth, defendant claims that the State repeatedly mentioned T.H.'s young age. In particular, defendant notes that the prosecutor argued that T.H. and his sister were "two courageous children" and T.H. was a "brave little boy," that defendant "let someone else" take T.H. to the hospital, that defendant yelled at "eight-year old" T.H. for touching the gun, and that this was a tragic end to a "slumber party." With respect to the slumber party, the prosecutor argued:

> "[T.H.] decided to have a slumber party with his friend Antonio[.] [I]nstead of that ending with [T.H.] saying, hey, Antonio, it was really great having you over. We sure

had fun staying up and watching a scary movie. It ended with [T.H.] saying something like, oh, my gosh, Antonio just shot me with this [d]efendant's gun."

However, as defendant observed in his brief to this court, some comment on T.H.'s age was necessary to permit a discussion of his perceptions and the accuracy and truthfulness of his testimony. T.H. was 10 years old when he testified in court, and calling a 10-year-old brave and courageous for testifying in court is just stating the obvious. The evidence at trial established that defendant did not take T.H. to the hospital and that he did yell at T.H. after discovering T.H. was shot. The prosecutor was allowed to argue that, after learning about the shooting, defendant exhibited concern about something other than T.H., namely, the gun. As for the tragic end to the sleepover, it *was* a tragic end to a sleepover. "A prosecutor may properly 'denounce a defendant's behavior, engage in some degree of invective and draw [reasonable] inferences unfavorable to the defendant if such inferences are based upon the evidence.' " *People v. Gonzalez*, 388 Ill. App. 3d 566, 595 (2008) (quoting *People v. Aleman*, 313 Ill. App. 3d 51, 66 (2000)); *People v. Baugh*, 358 Ill. App. 3d 718, 743 (2005) ("[t]he prosecutor may *** denounce defendant's activities [and] urge the administration of justice"); *People v. Liner*, 356 Ill. App. 3d 284, 297 (2005) ("[L]imited prosecutorial exhortations are proper ***." (Internal quotation marks omitted.)).

¶ 59 Defendant argues that the prosecutor's references to T.H.'s age were similar to the prosecutor's comments in *Liner*, 356 Ill. App. 3d at 296-97, that were found to be reversible error. In *Liner*, the prosecutor argued:

" '[W]hen you convict [the defendant], you make the whole county safe for all the Kayla Bakers that have a right to be asleep in their own home without having a guy like that come in and shove a gun in her face.

* * *

*** [L]ittle girls *** have *** a right to be protected by their father ***. And he almost died protecting her. ***. *** [S]he's got the right to be protected by the juries in [this] County. And when you find the Defendant guilty ***, you're not just protecting Kayla Baker. You're protecting every child and every citizen in every home in this county.' " *Liner*, 356 Ill. App. 3d at 297.

While the appellate court in *Liner* acknowledged that a prosecutor may engage in limited exhortations, this prosecutor crossed the line with an extended and general entreaty to protect all "little girls" and a challenge to the jury to send a message. *Liner*, 356 Ill. App. 3d at 296-97. While we do find that the prosecutor in the case at bar committed clear error for other reasons, the closing comments regarding T.H.'s age did not constitute a general entreaty to protect all little boys. In sum, we do not find the prosecutor's comments regarding T.H.'s age to be clear or obvious error.

¶ 60 Thus, we do not find that these additional points constituted clear or obvious error, and taken together, we do not find that any errors individually or cumulatively rose to the level of plain error.

¶ 61 V. First Prong: Not Closely Balanced

¶ 62 Having found clear and obvious error because of the prosecutor's references to defendant's failure to take responsibility, we next consider the first prong of the plain error doctrine and

whether the evidence was closely balanced. *Sebby*, 2017 IL 119445, ¶ 48; *Piatkowski*, 225 Ill. 2d at 565.

¶ 63     While defense counsel ably established discrepancies among the testimony of the three event witnesses, their testimony was largely in agreement on the key facts. As a result, we cannot find that this case was closely balanced.

¶ 64     To determine whether the evidence at trial was close, a reviewing court must examine all the evidence and "conduct a qualitative, commonsense assessment of it within the context of the case." *Sebby*, 2017 IL 119445, ¶ 53. "A reviewing court's inquiry involves an assessment of the evidence on the elements of the charged offense or offenses, along with any evidence regarding the witnesses' credibility." *Sebby*, 2017 IL 119445, ¶ 53.

¶ 65     A person commits the offense of being an armed habitual criminal if he or she possesses any firearm after having been convicted of two or more qualifying offenses. 720 ILCS 5/24-1.7(a) (West 2014). In the case at bar, the parties stipulated to the two qualifying offenses, leaving possession as the sole disputed element.

¶ 66     Possession may be actual or constructive. *People v. McCurine*, 2019 IL App (1st) 160817, ¶ 21 (in an armed habitual case, possession may be either actual or constructive); *People v. Faulkner*, 2017 IL App (1st) 132884-B, ¶ 39 (same). A person has actual possession when he has immediate and exclusive control over a thing. *People v. Schmalz*, 194 Ill. 2d 75, 82 (2000) (actual possession exists when a person has "immediate and exclusive dominion or control over" a thing). A person has constructive possession when he lacks actual possession but has both the power and the intention to exercise control over a thing. *People v. Anderson*, 2018 IL App (4th) 160037, ¶ 32 (the defendant had "the intent and capability to maintain control and dominion over the handgun, even if he lacked personal present dominion over it"). The control may be exercised directly or through another person. See Illinois Pattern Jury Instructions, Criminal, No. 4.16 (4th ed. 2000); *People v. Alston*, 302 Ill. App. 3d 207, 212 (1999) (approving generally of the jury instruction). "[I]f two or more persons share [the] immediate and exclusive control or share the intention and [the] power to exercise control" over a thing, "then each [one] has possession." *Schmalz*, 194 Ill. 2d at 82. Possession is a factual issue, and the trier of fact's finding will generally not be disturbed unless the evidence is so unbelievable, improbable, or palpably contrary to the verdict that it creates a reasonable doubt of defendant's guilt. *McCurine*, 2019 IL App (1st) 160817, ¶ 25; *People v. Wilkerson*, 2016 IL App (1st) 151913, ¶ 65.

¶ 67     Below, we analyze various discrepancies exposed at trial and explain why these discrepancies do not detract from the jury's verdict.

¶ 68     For example, T.H. testified that defendant spent the night of April 6, 2015, at the apartment, while D.B. testified that he did not. However, M.B. explained that defendant had spent the night but that he had left early in the morning before either she or her children were awake and then returned later. M.B.'s testimony about defendant's early departure and later return explains why the first time D.B. observed defendant was when she woke up and he was entering the apartment.

¶ 69     Ten-year-old T.H. testified that defendant removed a gun from under his mother's bed, wrapped it in one of T.H.'s shirts, and walked toward the kitchen. In contrast, 13-year-old D.B. testified that their mother retrieved the gun from under the bed, wrapped it in a shirt, and gave it to defendant, who walked toward the kitchen. Their mother M.B. testified, similar to D.B. but unlike T.H., that she (M.B.) was the one who retrieved the gun from under the bed and

wrapped it in a shirt. However, in contrast to D.B.'s testimony, M.B. testified that she (M.B.) walked to the back door with the gun, as defendant was coming up the stairs, and handed it to him as he entered. In contrast to M.B., both children testified that defendant walked out of the bedroom carrying the gun wrapped in a shirt.

¶ 70 Despite the discrepancies about whether it was M.B. or defendant who pulled the gun out from under the bed or whether it was M.B. or defendant who walked the gun into the kitchen, all three event witnesses were in agreement on the key fact that defendant was ultimately in possession of a gun wrapped in a shirt, while he was in the kitchen of the third-floor apartment. Until Antonio, the last person anyone observed in actual possession of the gun was defendant.

¶ 71 All three event witnesses testified about a conversation between defendant and M.B. that indicated defendant's possession. T.H. testified that his mother "told defendant to get the gun out of the house," but that statement was not admitted for the truth of the matter asserted, so we do not consider it for its truth. D.B. testified that, after defendant arrived at the apartment, defendant asked M.B. for "the gun" and told her that "he was gonna get into it with somebody." M.B. testified that, after defendant arrived back at the apartment, he was "still going off" about how "he was into it with somebody" and she told him to calm down and to "put that gun up" before he did something stupid with it in broad daylight. D.B. and M.B.'s testimony about this conversation each corroborates the other and demonstrates defendant's possession.

¶ 72 All three event witnesses testified about defendant's presence in the kitchen at a time when they could not observe what he was doing there and after he had received or retrieved the gun. T.H. testified that, after defendant removed the gun from under the bed, defendant walked toward the kitchen, but T.H. did not observe defendant while defendant was in the kitchen. D.B. testified that after her mother retrieved a gun from under the bed, wrapped it, and gave it to defendant, he walked out of the bedroom and toward the kitchen. D.B. observed him entering the kitchen, but she did not observe what he did in there since she started putting on her shoes. M.B. testified that, after handing defendant the gun, she went to the bathroom and she could not observe what defendant was doing during that time. All three event witnesses established that defendant had the opportunity, with respect to both time and location, to place the gun above the refrigerator.

¶ 73 T.H. testified that, after learning that T.H. had been accidentally shot, defendant started yelling at him for touching the gun and then fell on his knees, crying. D.B. testified that defendant was still yelling at T.H., when defendant fell to his knees. From these actions, one could reasonably infer that defendant was simply upset by the wounding of a child, but one could also reasonably infer that defendant was displaying a guilty conscience.

¶ 74 T.H. testified that, after defendant heard about the shooting, defendant walked back toward the apartment, and M.B. testified that she handed defendant her house keys. D.B. testified that she did not observe where defendant went and did not observe her mother hand defendant anything. Both T.H. and M.B.'s testimony indicate that defendant had the opportunity to remove the gun from the apartment.

¶ 75 T.H. explained why he had originally lied to the first responders—because he did not want his mother to go away—and his mother did, in fact, go away as a result of this incident, thereby proving that T.H.'s fears were not unfounded. Similarly, his mother, M.B., gave the same reason for not initially telling the truth. T.H. also explained why he subsequently told the truth—because his grandmother told him to.

¶ 76      Whether or not the jurors believed M.B.'s claims that she did not know the gun was under the bed, her knowledge or possession of the gun did not undercut defendant's possession of it. It is stating the obvious to observe that different people may have actual possession of the same gun at different points in time. In addition, more than one person may possess one gun, even at the same time. *Schmalz*, 194 Ill. 2d at 82. "The rule that possession must be exclusive does not mean that the possession may not be joint ***." *Schmalz*, 194 Ill. 2d at 82. Thus, even if M.B. knew the gun was under the bed, that fact did not vitiate the fact that defendant was still the last person to exercise dominion and control over it, prior to Antonio.

¶ 77      Defense counsel argued repeatedly in closing argument that M.B. was drunk. At trial, M.B. testified that she was drinking vodka both the night before and the morning of the shooting, and defendant argued, in essence, that her drinking cast doubt on the accuracy of her testimony and memory. However, there was no testimony at trial about the amounts she consumed or that she acted or appeared under the influence of the liquor.

¶ 78      Also in closing argument, defense counsel stressed that Detective Flagg interviewed T.H. after the shooting, that Flagg created a police report to memorialize the interview, and that nowhere in the report does it say that T.H. observed defendant with a gun. Nonetheless, T.H. came to trial and testified that he had observed defendant with a gun. The defense argued that the gun "never came up until he got on the witness stand." On cross-examination, T.H. testified that he remembered speaking to a detective, that he told the detective that he observed defendant with the gun and the shirt, and that the detective was taking notes as T.H. was talking to him. Thus, there is a discrepancy between the police report, which was used to memorialize important facts and which does not mention that T.H. observed defendant with a gun, and T.H.'s trial testimony that he told the detective this important fact. Defense counsel argued in closing that T.H.'s version changed because "[h]e's been hanging out with mom" and "hanging out with his sister even though his mother lost custody." At first, T.H. repeated his mother's story that he had been shot outside. But after speaking with his grandmother, he told the police that he had been shot in the apartment. The credibility of a witness's testimony is determined by the fact finder, not by a reviewing court that has only a cold record. *People ex rel. Hartrich v. 2010 Harley-Davidson*, 2018 IL 121636, ¶ 26 (the trial court is in a better position to evaluate the "credibility of the witnesses than is this court, with our review limited to a cold, written record").

¶ 79      During closing argument, defense counsel argued that M.B. "says that she wrapped the gun in the shirt. That it was a brightly colored shirt. I asked her was it a black shirt? No. It was multi-colored. It was a colorful shirt. Well, T.H. said it was a black shirt. She said it was a colorful shirt." The color of the shirt is a clear, concrete discrepancy, which counsel utilized appropriately in an attempt to undermine credibility. However, we cannot find this discrepancy undermined their credibility much, where all three event witnesses agreed on the more important fact that defendant held the gun as it was wrapped in the shirt. Again, the credibility determinations are made by the fact finder.

¶ 80      When denying defendant's posttrial motion for a new trial, the trial court considered that, while there were discrepancies on minor details, the three event witnesses agreed on all the important facts, and we reach the same conclusion.

¶ 81      All three agreed (1) that there was a gun, hidden under the bed in the mother's room, that defendant wanted, that was wrapped in a shirt, and that was carried from the mother's room to the kitchen; (2) that there was some conversation between defendant and the mother that

indicated his possession of the gun; and (3) that defendant was in the kitchen, for some period of time after receiving possession of the gun, when no one else was in the kitchen.

¶ 82    The State's evidence further established that (1) M.B. testified that she told defendant to put the gun "up" and no one contradicted her on that fact; (2) T.H. testified that the gun was, in fact, up on top of the cabinet above the refrigerator, and no one contradicted him about that fact; (3) M.B. testified that defendant removed the gun from the shirt; (4) T.H. testified that his shirt was subsequently "in the window"; (5) T.H. and D.B. both testified that, after defendant heard about the shooting, he dropped to his knees, upset; (6) T.H. testified that, after learning of the shooting, defendant walked back to the apartment, while D.B. testified that she did not know where he went; (7) M.B. testified that she handed defendant the house keys, which D.B. testified that she did not observe; (8) M.B. testified that defendant called her at the hospital and told her that "if he had to turn his self in he will"; and (9) defendant fled when a police officer asked him his name, less than two blocks and four days from the place and time of the shooting.

¶ 83    There was no evidence suggesting that anyone but defendant exercised dominion and control over the gun when it was placed on top of the cabinet because M.B. testified that she was in the bathroom, T.H. testified that he did not observe defendant in the kitchen, and D.B. testified that she went to her room to put on her shoes.

¶ 84    After examining all the evidence and "conduct[ing] a qualitative, commonsense assessment of it" with respect to the disputed element of the charged offense and the witnesses' credibility (*Sebby*, 2017 IL 119445, ¶ 53), as we are required to do, we cannot find that the evidence was closely balanced.

¶ 85                                    VI. Second Prong

¶ 86    Defendant also asks us to consider his claim of prosecutorial misconduct under the second prong of the plain error doctrine.

¶ 87    "Where the defendant claims second-prong plain error, a reviewing court must decide whether the defendant has shown that the error was so serious it affected the fairness of the trial and challenged the integrity of the judicial process." *Sebby*, 2017 IL 119445, ¶ 50.

¶ 88    Defendant argues that the prosecutorial misconduct in his case was pervasive and, thus, requires reversal under *People v. Blue*, 189 Ill. 2d 99, 138-39 (2000), and *Johnson*, 208 Ill. 2d at 84. In *Johnson*, the supreme court summarized its holding in *Blue* as follows: in *Blue*, "a unanimous court held that the cumulative effect of prosecutorial misconduct and *trial error* had deprived the defendant of a fundamentally fair trial and thus warranted reversal notwithstanding overwhelming evidence of defendant's guilt." (Emphasis added.) *Johnson*, 208 Ill. 2d at 60 (discussing *Blue*, 189 Ill. 2d at 138-39); see also *Johnson*, 208 Ill. 2d at 84 ("As in *Blue*, we see in this case cumulative error and a pervasive pattern of unfair prejudice denied defendant a fair trial ***."). The case at bar does not present the type of pervasive prosecutorial conduct that occurred in *Blue* and *Johnson*, which rose to the level of second-prong plain error. In this appeal, no substantial trial errors were claimed, only substantial errors in opening statement and closing argument. Similarly, in *Libberton*, 346 Ill. App. 3d at 933, which both parties cite, the appellate court found no reversible error based on prosecutorial misconduct, where there was no substantial trial error.

¶ 89 In sum, we can find neither first nor second prong plain error.

## VII. Fines and Fees

¶ 91 In his original brief to this court, defendant also raised claims about certain fines and fees, but he acknowledged in his reply brief that this court lacked the authority to adjudicate these claims under Illinois Supreme Court Rule 472(e) (eff. May 17, 2019). Both the State and defendant contend that, under Rule 472(e), this court must remand these claims to the trial court, and we agree.

¶ 92 The newly revised rule provides that,

> "[i]n all criminal cases pending on appeal as of March 1, 2019, or appeals filed thereafter in which a party has attempted to raise sentencing errors covered by this rule for the first time on appeal, the reviewing court *shall* remand to the circuit court to allow the party to file a motion pursuant to this rule." (Emphasis added.) Ill. S. Ct. R. 472(e) (eff. May 17, 2019).

In the case at bar, defendant filed his notice of appeal on December 8, 2016, and we did not rule on his appeal until today. Thus, his case was still "pending on appeal as of March 1, 2019." Ill. S. Ct. R. 472(e) (eff. May 17, 2019).

¶ 93 Pursuant to the express words of Rule 472(e), we "shall remand" this issue "to the circuit court to allow" defendant "to file a motion pursuant to this rule." Ill. S. Ct. R. 472(e) (eff. May 17, 2019); see *People v. Whittenburg*, 2019 IL App (1st) 163267, ¶ 6 (we remanded to the trial court pursuant to Rule 472(e) to allow defendant to file a motion "challenging the fees and fines imposed as a part of his sentence"); *People v. Sanders*, 2019 IL App (1st) 160718, ¶ 53 ("[w]ith respect to these fines-and-fees issues, we remand to the circuit court for further proceedings consistent with the newly revised" Rule 472(e)); *People v. Johnson*, 2019 IL App (1st) 161104, ¶ 34 ("after this appeal was fully briefed, our supreme court adopted new Illinois Supreme Court Rule 472," and so we remanded pursuant to it); *People v. Loggins*, 2019 IL App (1st) 160482, ¶ 131.

¶ 94 We are aware that, in *People v. Barr*, 2019 IL App (1st) 163035, a panel of this court found that the newly revised Rule 472 did not apply retroactively and, thus, the appellate court did review fines-and-fees issues raised for the first time on appeal. However, the court in *Barr* was interpreting a version of the rule that took effect on March 1, 2019, whereas our supreme court further revised the rule on May 17, 2019, to eliminate any doubt about how we should proceed. Thus, we remand the fines-and-fees issues to the trial court to permit defendant to file a motion there pursuant to Rule 472.

## CONCLUSION

¶ 96 For the foregoing reasons, we affirm defendant's conviction. However, pursuant to Rule 472, we remand the fines-and-fees issues to the trial court to allow defendant to file a motion in that court, if he chooses to do so.

¶ 97 Affirmed and remanded.