2021 IL App (2d) 170643-U
No. 2-17-0643
Order filed March 11, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 14-CF-1231 |
| GEORGE WHITE, | ) ) ) | Honorable Brendan A. Maher, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE BRIDGES delivered the judgment of the court.
Justices Hutchinson and Zenoff concurred in the judgment.

**ORDER**

¶ 1   *Held*: There was sufficient evidence for the jury to find defendant guilty beyond a reasonable doubt. Therefore, we affirm.

¶ 2   Following a jury trial, defendant, George White, was convicted of failure to report an accident involving death after leaving the scene (625 ILCS 5/11-401(b) (West 2014)), seven counts of aggravated driving under the influence (625 ILCS 5/11-501 (West 2014)), reckless homicide (720 ILCS 5/9-3(a) (West 2014)), and aggravated driving after revocation or suspension (625 ILCS 5/6-303(d-3) (West 2014)). On appeal, he argues that there was insufficient evidence of identity,

specifically that he was the driver of the car involved in the accident at issue, to prove him guilty beyond a reasonable doubt. We affirm.

¶ 3                              I. BACKGROUND

¶ 4     On July 9, 2014, defendant was charged by superseding indictment with failure to report an accident involving death after leaving the scene (625 ILCS 5/11-401(b) (West 2014)) (count I); two counts of aggravated driving under the influence of alcohol involving death (625 ILCS 5/11-501(d)(1)(F) (West 2014)) (counts II and III); aggravated driving under the combined influence of alcohol and drugs involving death (625 ILCS 5/11-501(d)(1)(F) (West 2014)) (count IV); two counts of aggravated driving under the influence of drugs involving death (625 ILCS 5/11-501(d)(1)(F) (West 2014)) (counts V and VI); two counts of aggravated driving under the influence of alcohol (625 ILCS 5/11-501(a)(2) (West 2014)) (counts VII and VIII); aggravated driving under the combined influence of alcohol and drugs (625 ILCS 5/11-501(a)(5) (West 2014)) (count IX); two counts of aggravated driving under the influence of drugs (625 ILCS 5/11-501(d)(1)(A), 501(d)(2)(C) (West 2014)) (counts X and XI); reckless homicide (720 ILCS 5/9-3(a) (West 2014)) (counts XII); and aggravated driving after revocation or suspension (625 ILCS 5/6-303(d-3) (West 2014)) (count XIII).

¶ 5     On February 27, 2015, defendant filed a second amended motion to suppress identification evidence as unreliable. After a hearing on March 13, 2015, the trial court granted the State's motion for a directed finding.

¶ 6     Defendant's first jury trial ended in a mistrial, and he chose to proceed *pro se* for his second jury trial. Testimony in the second trial began on September 7, 2016, and we summarize the evidence presented.

¶ 7     At about 4:40 a.m. on May 20, 2014, David Logterman was driving a red pickup truck south on North Second Street near Y Boulevard in Rockford. There were three southbound lanes. Logterman was in the far left-hand lane, and Michael Whisman was in the middle lane, behind Logterman, driving a Hummer H3. Whisman noticed a white car driving erratically and very fast in the other direction. Whisman slowed down and saw the white car hit the median, guardrail, and a pole. Whisman swerved to the right and stopped, and he saw the white car ricochet so hard that its back end ended up on top of the red truck. Whisman called 911 and then stepped outside of his vehicle. It was dark outside, the streetlights were on, and Whisman kept his headlights on. Whisman saw two young white men begin to approach the truck. He also saw the driver of the white car exit, look inside the red truck, and go back to the driver's side of the white car and retrieve something. The driver then walked in front of Whisman and in the path of the Hummer's headlights before crossing a field and heading north. Whisman testified that he got a good look at the driver, whom he identified in court as defendant. At the accident scene, Whisman saw that defendant was wearing a gray sweatshirt and blue jeans with a distinctive orange stripe on one of the legs, and Whisman identified the jeans in court. However, Whisman did not mention the orange stripe in the 911 call. Defendant did not appear to be injured or have trouble walking.

¶ 8     Meanwhile, at about 4:30 a.m. on May 20, 2014, Ross Enderle was outside with his friend, Richard Speaker, in front of Speaker's house, which was close to North Second Street and Y Boulevard. It was dark outside. At about 4:40 a.m., Enderle heard a very loud, long, metallic grinding and screeching noise coming from North Second Street. He and Speaker walked about 100 yards to the road, and Enderle saw that the bumper of a white car was through the windshield of a red truck. He called 911. As they approached, someone came up to Enderle and asked if he could use Enderle's phone to call "his girl." The man was black, middle-aged, and wearing jeans

and a dark sweatshirt that may have been gray. Enderle did not recall anything specific about the jeans. The man was taller than Enderle and was just a few feet away from him. Enderle ignored the man because Enderle was talking to the 911 operator, and Enderle continued to walk towards the vehicles. He saw a man slumped over in the red truck. The 911 operator asked if the truck's driver had a pulse or was breathing. Enderle and Speaker pulled open the truck's passenger door. Speaker leaned in and said he could feel a pulse. The man who asked to use the phone was walking behind the truck. Speaker shouted to the man that he needed to stay, but the man kept walking. Enderle saw the man walking over to the grassy area that Enderle and Speaker had crossed to get to the accident scene, and walk northwest. Enderle saw that the white car did not have a driver in it, and he thought that the man must have been the car's driver. The man seemed to walk with a limp, but Enderle did not notice any blood on him. About one minute after Enderle's call with the 911 operated ended, the police arrived. They separated Enderle, Speaker, and Whisman. Enderle told the police that he would be able to recognize the man if he saw him again.

¶ 9    Speaker testified that when they approached the accident, he saw a man standing near the vehicles. The man was tall, black, clean-shaven, and wearing dark clothing. Speaker did not notice anything distinct about his clothing. Speaker asked the man if he was all right, and the man just made some kind of noise. The driver's side door of the white car was open. Speaker went to check the driver of the red truck and found a pulse. The man who had been standing was walking away, and Speaker yelled that the man could not leave the crime scene and had to stay. The man said that he had to pee and kept walking.

¶ 10    Richard Ainsworth testified that he was traveling southbound on North Second Street when he saw headlights of a white car going northbound at a high rate of speed. The car jumped the median, hit the cement embankment, and the back end of the car came up, spun clockwise, and

landed on a red pickup truck. Ainsworth pulled over, and his car's "BAIID" device (Breath Alcohol Ignition Interlock Device) started beeping, so he had to blow into it. About one minute after the accident, he saw a black male go in the white vehicle. Ainsworth did not remember the incident very well.

¶ 11 A wallet containing identification belonging to defendant was found in the front of the white car, a Chevy Impala. Officer Richard Dodd was dispatched shortly after 5 a.m. to look for defendant, who was described as about six feet tall wearing blue jeans and a gray sweatshirt. Dodd looked up defendant's photo on his computer and previous reports, which revealed an address of 1236 Revell Street for defendant. That address was about seven to ten blocks south of the crash site, and Dodd drove to that location. Defendant was standing on the home's porch. He was wearing a black T-shirt, blue jeans with an orange and yellow tiger on the pant leg, black socks, and black flip flops. As Dodd approached, defendant asked a woman inside to give him a child to hold. When Dodd was about one to two feet away from defendant, he noticed a smell of alcohol. Defendant was not sweating or breathing heavily, nor did he try to run away. Dodd asked defendant what kind of car he drove, and defendant said that he did not drive. Dodd asked how he got around, and defendant replied that his girlfriend drove him. In response to questions, defendant said that his girlfriend drove a Chevy Impala that was missing, but he did not seem concerned about the car or ask if it had been found.

¶ 12 Dodd handcuffed defendant and put him in his squad car. Dodd did not notice any injuries on defendant, nor did defendant complain about any pain or injuries. Dodd did not notice anything unusual about how defendant was walking. He asked defendant if he would consent to a blood and urine test, but defendant declined. The fire department arrived to check defendant's medical condition, but he refused. Dodd then transported defendant back to the accident scene.

¶ 13    Officer Sean Welsh testified that the Impala was registered to Kara Durfey, and "communication center" provided him with a description of the suspect driver as being a black male wearing a dark gray hooded sweatshirt and jeans; the description did not state that the jeans had a design. Welsh further testified that he explained to Whisman that someone was going to be brought to the scene who may or may not have been involved in the accident. Whisman was to tell Welsh whether he recognized the person, and if so, what features or articles of clothing led to the recognition. Whisman was a little bit upset but calm. Defendant was brought to the accident scene at about 5:45 a.m. and taken out of a squad car. Upon seeing defendant, Whisman's demeanor changed in that his voice became shaky, he was visibly trembling, and he appeared upset. Whisman said that he recognized defendant as the driver of the Impala who got out of that vehicle, looked inside the red pickup truck, and then walked away from the scene. Whisman recognized defendant by his face and by his pants, which were blue jeans with a very distinctive orange stripe. Whisman said that defendant was no longer wearing the dark gray sweatshirt.

¶ 14    Whisman testified that he was standing about 20 feet from defendant during the show up and was "[v]ery sure" that defendant was the driver. Whisman testified that he recognized defendant's face and that defendant still had the same jeans on.

¶ 15    Enderle testified that the police told him that there was someone they wanted to show him. A squad car pulled up, and a man got out with one officer on either side of him. He was about 60 feet away. An officer asked Enderle if he recognized the man, and Enderle said that he was not sure. They then moved the man to about 30 feet away, and Enderle recognized him as the man who had asked to use his phone, saying that he was 85% sure. The man was wearing the same clothes minus the sweatshirt, and Enderle recognized his face as well. It had been about an hour since the man had asked to use his phone. Before the show up, Enderle may have heard that the

police had found a barefoot man running in south Rockford and that they wanted Enderle to look at him; he admitted testifying to this at a prior proceeding. At the time of trial, it had been too long since the incident for Enderle to still recognize the man.

¶ 16    Officer Ryan Lane testified as follows. He assisted Enderle during the show up. Officer Dodd parked his car about 50 feet away from Enderle and told defendant to step out of the car. Enderle was asked whether he recognized defendant. Enderle said that he thought that he recognized the person but was not sure; he was only 50% sure. Lane admitted that his field notes stated that Enderle said that he was unsure from 50 feet away, and the notes did not mention 50%. Enderle said that it might be helpful if they moved closer, so they moved to a distance of about 30 feet away from defendant. Enderle said that he was about 85% sure that defendant was the man that he saw walking around the crash site. He recognized the jeans with the orange stripe down the side. Enderle also said that the man was no longer wearing a hoodie.

¶ 17    Speaker was shown a photo lineup of six photos at the police station but did not identify anyone.

¶ 18    After the in-person show up, defendant agreed to submit blood and urine samples, so the police took him to a hospital. Defendant told the nurse that he had rib pain and that he was taking medication for depression, anxiety, swelling in his knee, and pain. However, he refused treatment for the rib pain. The police then transported defendant to the police station for a video-recorded interview. After the interview, defendant was transported back to the hospital due to complaints about rib pain. While waiting to see a doctor there, defendant asked an officer if someone had died in the crash they were investigating. The officer answered in the affirmative, and defendant frowned and began to cry. The officer did not recall defendant saying that the police were claiming that he was the other driver. An analysis of defendant's blood showed .187 grams per deciliter of

ethanol. Ethanol is present in alcoholic drinks as well as other substances like nail polish remover. Defendant's blood also revealed the presence of benzoylecgonine, a cocaine metabolite. Cocaine usually leaves the blood four to six hours after use. Defendant's urine had cocaine, cocaine metabolites, and THC metabolites. The presence of cocaine in the urine indicated that the drug had been consumed 6 to 12 hours prior. When cocaine is in the urine but not the blood, it no longer has intoxicating effects. There were no pain medications found in defendant's blood or urine.

¶ 19    Kara Durfey testified that in May 2014, she lived at 1236 Revell with defendant and her children. She owned a white Impala, which defendant never drove. On May 19, 2014, they made dinner, and defendant was drinking alcohol. Durfey had a drink and fell asleep watching the 10 o'clock news. She woke up the next day at 5 a.m., went to the bathroom, and then noticed that her car was gone. She got a cigarette, went outside, and saw defendant standing on the porch. Defendant was not bleeding, breathing heavily, sweating, or smelling of alcohol. She asked him where the car was, and he replied that he did not know and that she should call the police. Durfey was about to call the police when several police cars showed up.

¶ 20    An accident investigator testified that three seconds before the Impala's airbag was deployed, it was going 82 miles per hour, and one second prior, it was going 73 miles per hour. The driver did not brake within eight seconds of the airbag's deployment. A mechanic testified that the Impala's brakes were operational. A forensic scientist testified that she tested a DNA profile from the driver's side front airbag of the Impala and found information from 4 out of 15 locations in the DNA. There was no conclusive evidence as to whether the DNA was from a male or female. Defendant could not be excluded as having contributed to the sample. Approximately 1 in 620 black, 1 in 250 white, and 1 in 150 Hispanic unrelated individuals also could not be

excluded as having contributed to the DNA profile. A forensic pathologist testified that Logterman died as a result of injuries sustained in the accident.

¶ 21    A traffic reconstructionist opined as follows. The Impala struck the raised four-inch median that separated the ramp from Longwood from North Second Street and then struck the raised five-inch median separating the north and southbound traffic on North Second Street. The vehicle then struck a guardrail on its front passenger side and collapsed the guardrail to the fullest extent possible. This caused the Impala to rotate clockwise, and its rear end hit the cab of the truck. When it came to a rest, the back end of the Impala was 28.5 inches off of the ground. The fire department had to remove the truck's roof to extricate the victim. Inside the Impala, the traffic reconstructionist found another wallet with identification and credit cards belonging to Durfey, as well as other items in her name.

¶ 22    Defendant's testimony from his first trial was read to the jury; we summarize his testimony in relevant part.[1] On May 20, 2014, he was living at 1236 Revell Avenue with Durfey, his girlfriend, and their three children. Durfey was also pregnant with their fourth child. Defendant had total knee replacement surgery on February 25, 2014, followed by 10 weeks of physical therapy. On May 20, 2014, defendant was still taking pain medication and could not walk more than 10 minutes, or his knee would swell. He could not run or jump. Defendant dealt with the pain by taking pain medication, drinking alcohol, and using illegal drugs.

---

[1] At defendant's second trial, he testified that other than a few (unspecified) misstatements, the recitation of his testimony from the first trial was accurate.

¶ 23    In the afternoon of May 19, 2014, defendant was grilling outside and drinking alcohol. He, Durfey, and the children later ate dinner. Durfey fell asleep on the couch around 10 p.m., and defendant got the keys to the Impala and sat in the car to drink beer and listen to music because they did not have a stereo in the house. He then smoked a cannabis blunt laced with cocaine in the backyard, returned to the house, and fell asleep. He drank a total of about five beers that day. In the morning, defendant heard sirens, went outside, and saw that the car was gone. Durfey came out, and defendant asked where the car was. She said that she did not know. Their neighbor and her two-year-old daughter came over and asked what was happening, and defendant said to call 911. Defendant sat down with the two-year-old and asked Durfey for a cigarette. Durfey gave him one, and the police showed up. In response to questions, defendant provided Officer Dodd with his name and date of birth. Dodd asked defendant to tell him about the car accident, and defendant said that he had been at home and did not know about an accident. Dodd handcuffed defendant, placed him in a squad car, and, after about 25 minutes, transported him to the accident scene. Defendant recognized the Impala there. He was taken out of the squad car and asked to face different directions. Defendant told the officers that he had pains due to a history of abdominal issues, and the police took him to the hospital. He had various tests done that showed no bruising, cuts, abrasions, or swelling.

¶ 24    The police then took defendant to the police station and interviewed him. Defendant told them that he had four beers and fell asleep around 10 p.m. Defendant did not know why he made this statement during the interview but attributed it to his having been drinking, taking pain medication, and smoking cannabis. After the interview, defendant complained about rib pain and was taken back to the hospital. Defendant had stomach pain because he was drinking and using drugs without eating enough food. Defendant had never driven the Impala.

¶ 25    On September 13, 2016, the jury found defendant guilty of counts I, II, III, IV, VII, VIII, IX, XI, XII, and XIII. See *supra* ¶ 4. The jury found defendant not guilty of counts V, VI, and X. See *supra* ¶ 4.

¶ 26    Defendant filed a motion for a new trial on September 28, 2016. He subsequently obtained counsel, who adopted defendant's motion for a new trial. The trial court denied the motion on April 7, 2017. It further vacated the convictions on counts VII, VIII, and IX based on the one act, one crime rule.

¶ 27    On April 28, 2017, the trial court sentenced defendant to 23 years' imprisonment on count I; 23 years' imprisonment on counts II, III, and IV, which were concurrent with each other but consecutive to count I; and 3 years' imprisonments on counts XII and XIII, which were also concurrent with each other but consecutive to the other sentences. The trial court entered a conviction on count XI but found that it merged with counts II, III, and IV. Defendant filed a motion to reconsider the sentence on May 17, 2017. The trial court denied the motion on July 31, 2017, and defendant timely appealed.

¶ 28                                    II. ANALYSIS

¶ 29    On appeal, defendant argues that he was not proven guilty beyond a reasonable doubt. When examining the sufficiency of the evidence, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Collins*, 106 Ill. 2d 237, 261 (1985). The trier of fact has the responsibility to assess witnesses' credibility, weigh their testimony, resolve inconsistencies and conflicts in the evidence, and draw reasonable inferences from the evidence. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). We will not reverse a criminal conviction based on insufficient evidence unless the

evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt. *People v. Gray*, 2017 IL 120958, ¶ 35.

¶ 30     Defendant does not dispute any of the elements of the convictions against him other than the State failed to prove identity, *i.e.*, that he was the individual who was driving the Impala on May 20, 2014, when the accident occurred. Defendant argues that the State's evidence hinged on the testimony of Whisman and Enderle, who identified him as the driver after he was presented to them in a one man show up. Defendant points out that although one man show ups are generally condemned, they have been consistently upheld when they are justified by the circumstances. *People v. Ramos*, 339 Ill. App. 3d 891, 897 (2003). He recognizes that the use of a show up is justified "when it is necessary to facilitate a police search for the real offender," and that the courts have "consistently upheld prompt identification of a suspect by a witness or victim near the scene of the crime where they foster the desirable objectives of a fresh, accurate identification, which may lead to the immediate release of an innocent suspect and at the same time enable the police to resume the search for the fleeing offender while the trail is still fresh" (*People v. Hicks*, 134 Ill. App. 3d 1031, 1036 (1985)), which is what occurred here. The factors to be considered in the reliability of an identification are (1) the witness's opportunity to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated at the confrontation; and (5) the length of time between the crime and confrontation. *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972); *People v. Simpson*, 172 Ill. 2d 117, 141 (1996). The jury in defendant's trial was given a jury instruction to consider these factors in weighing the identification testimony.

¶ 31     Defendant argues as follows. No witness ever saw him driving the Impala, as Whisman merely saw him exiting the vehicle at some point. Whisman's testimony was riddled with

inconsistencies, including Whisman's admission that he had misstated that the driver left in a southeast direction, which would have been behind Whisman and would not have placed the man within Whisman's view. Further, Whisman identified defendant in a one-man show up in which defendant had officers on either side of him. Officer Welsh testified that Whisman recognized defendant from his jeans, which had a distinctive orange stripe, and his face. "However[,] Officer Welsh stated that *** Whisman's earlier description was that the driver was a black male with a thin build wearing a gray hooded sweatshirt and blue jeans with a design including a distinctive orange stripe or design though he did not give a height description or facial hair."

¶ 32     Defendant further argues that Enderle did not see anyone in the white car and did not pay much attention to the person who asked to use his cellphone. Enderle described the person as a middle-aged black man wearing jeans and a dark sweatshirt that may have been gray, but he did not remember anything distinctive about the jeans. Like Whisman, Enderle identified defendant in a one man show up with an officer on both sides of him. Enderle had also heard the police saying that they had found a barefoot person running in Rockford 20 minutes before the show up. Enderle was not able to make an identification from 60 feet away, and from 30 feet away, he was only 85% sure of his identification. Speaker, who was with Enderle, was not even able to identify defendant from a photo lineup.

¶ 33     Defendant highlights that he never told the police that he had been involved in the accident, but rather stated that he was at home when it occurred, and that he provided consistent testimony at trial. Defendant argues that Durfey, who owned the car, testified that defendant never drove the vehicle, and that when the police arrived, defendant was not bleeding, breathing heavily, sweating, or smelling of alcohol. Finally, defendant contends that none of the physical evidence pointed to

him as being the driver of the Impala, that the DNA evidence was inconclusive at best, and that none of his fingerprints were even found inside the vehicle.

¶ 34    Defendant's argument is not persuasive because the "testimony of a single witness is sufficient to convict if the testimony is positive and credible ***." *Gray*, 2017 IL 120958, ¶ 36. Here, the evidence at trial showed that the only people in the immediate vicinity of the Impala and the red truck right after the accident were Whisman, Enderle, Speaker, Logterman, and a black male. Further, Whisman saw the black male exit the driver's side of the Impala, look inside the red truck, go back to the driver's side of the white car, and retrieve something. Enderle testified that the man asked to use Enderle's cell phone to call "his girl." Accordingly, there was sufficient evidence that the black male was the driver of the Impala.

¶ 35    Looking at the *Biggers* factors, Whisman testified that defendant walked in front of him, in the path of Whisman's vehicle's headlights. He testified that he got a good look at defendant, whom he described as wearing a gray sweatshirt and blue jeans with a distinctive orange stripe on one leg. During the show up, which occurred about one hour after the accident, Whisman was about 20 feet from defendant and testified that he was "[v]ery sure" that defendant was the man Whisman saw at the accident scene. He testified that he recognized defendant's face, and defendant still had the same jeans on. Officer Welsh testified that upon seeing defendant, Whisman's demeanor changed in that his voice became shaky, he was visibly trembling, and he appeared upset. Whisman told Welsh that he recognized defendant by his face and by his pants, which were blue jeans with a very distinctive orange stripe. Therefore, Whisman's identification of defendant was very reliable when applying the *Biggers* factors.

¶ 36    Though Whisman stated on the day of the incident that the man walked in a southeast direction, Whisman testified at trial that he was not sure of the direction but had consistently stated

that defendant had walked in front of him, turned right, and walked in the direction of Loves Park. The direction of defendant's travel was, at best, an inconsistency in the evidence for the jury to resolve, and it did not render Whisman's identification unreliable.

¶ 37 Moreover, in addition to Whisman, Enderle identified defendant as the black man at the scene. Applying the *Biggers* factors, the man came within a few feet of Enderle and asked if he could use Enderle's phone. Enderle was more focused on the phone call with the 911 operator than the man, but he described him as black, middle-aged, and wearing jeans and a dark sweatshirt that may have been gray. At the show up about one hour later, Enderle was not able to identify defendant from 50 to 60 feet away, but, when defendant was moved to about 30 feet away, Enderle said that he was 85% sure that defendant was the man. The man was wearing the same clothes minus the sweatshirt, and Enderle recognized his face as well. Therefore, while Enderle's identification of defendant was not as strong as Whisman's, it was additional evidence pointing to defendant as the driver.

¶ 38 In addition to the witnesses' identification evidence, there was significant circumstantial evidence that defendant was driving the Impala at the time of the accident. The car was registered to Durfey, defendant's girlfriend. Defendant was admittedly the last person known to be in control of the vehicle, as he testified that at some point after 10 p.m. on May 19, 2014, he had the keys to the Impala and was sitting in the car drinking beer and listening to music. Durfey testified that she was asleep and did not see defendant from about 10 p.m. that night until shortly after 5 a.m. the next morning. At that time, the Impala was gone, and defendant was standing outside on the porch. The house was about 7 to 10 blocks from the site of the crash, and the Impala's driver was seen walking away from the accident, so the jury could have reasonably believed that defendant walked home. Dodd testified that defendant said that the Impala was missing, yet defendant did not seem

concerned about the car or ask if it had been found. A wallet with defendant's identification was found in the front of the Impala. Further, defendant complained about rib pain on more than one occasion, which could have resulted from the accident. When defendant learned that a person had died in the accident, he started crying, which can be interpreted as evidence of a guilty conscience. *Cf. People v. Williams*, 2020 IL App (1st) 163417, ¶ 73 (one could reasonably infer that the defendant was displaying a guilty conscience when he fell to his knees and cried). Defendant's blood provided evidence of being under the influence of alcohol, which could have caused the accident. Tellingly, defendant could not be excluded as contributing to the DNA sample found on the driver's side front airbag of the Impala, which would have deployed during the accident, and only about 1 in 620 black unrelated individuals also could not be excluded as having contributed to the DNA profile. Accordingly, viewing the evidence in the light most favorable to the State, a rational trier of fact could have found beyond a reasonable doubt that defendant was the driver of the Impala at the time of the accident.

¶ 39                                  III. CONCLUSION

¶ 40    For the reasons stated, we affirm the judgment of the Winnebago County circuit court.

¶ 41    Affirmed.