2023 IL App (1st) 220112-U

No. 1-22-0112

Order filed September 20, 2023

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County. |
| v. | ) ) | No. 15 CR 6620 |
| JEFFREY WILLIAMS, | ) ) | Honorable Thaddeus L. Wilson, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE D.B. WALKER delivered the judgment of the court.
Presiding Justice Reyes and Justice R. Van Tine concurred in the judgment.

**ORDER**

¶ 1   *Held*: We affirm the circuit court's summary dismissal of defendant's *pro se* postconviction petition which failed to establish arguable claims of ineffective assistance of trial and appellate counsel.

¶ 2   Defendant Jeffrey Williams appeals from the circuit court's summary dismissal of his *pro se* petition for relief pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq*. (West 2020)). On appeal, defendant contends that the court erred by dismissing the petition when it set forth arguable claims of ineffective assistance of trial and appellate counsel. We affirm.

¶ 3     The facts of this case were detailed in our disposition of defendant's direct appeal, and we recite only those facts relevant to the issues in this appeal.

¶ 4     Following an April 7, 2015, incident in which a child was accidently shot by another child, defendant was charged with two counts of armed habitual criminal (AHC), four counts of unlawful use or possession of a weapon by a felon, two counts of aggravated unlawful use of a weapon, and two counts of unlawful use of a weapon. Relevant here, the counts for AHC alleged that defendant possessed a firearm (count I) and a second firearm (count II) after being convicted of certain qualifying offenses. At trial, the State proceeded on counts I and II for AHC. The remaining counts were nol-prossed.

¶ 5     T.H., who was 10 years old at the time of trial, testified that on April 7, 2015, he was 8 years old and lived in an apartment with his mother M.B., his sister D.B., and defendant.[1] D.B. had her own room, and T.H. generally slept in M.B.'s room. When defendant spent the night, however, defendant slept in M.B.'s room. On the night of April 6, 2015, T.H. hosted his friend Antonio for a sleepover, and they slept in the front room.[2] Defendant spent the night and slept in M.B.'s room.

¶ 6     The next morning, T.H. and Antonio witnessed M.B. tell defendant to "get the gun out of the house." T.H. saw defendant retrieve one of T.H.'s shirts, remove a firearm from under a bed, place the firearm in the shirt, and walk toward the kitchen. T.H. then heard the back door close. A few minutes later, M.B. and D.B. left the house. T.H. and Antonio played, and then Antonio entered the bedroom and looked under the bed. T.H. saw another firearm under the bed.

_____

[1] As we did in our disposition of defendant's direct appeal, we refer to M.B. by initials since she shares a family name with her underage daughter.
[2] The transcript does not contain Antonio's family name.

¶ 7    The boys next went to the kitchen and climbed onto the counter. Antonio "grabbed [a] gun and got down." Antonio pulled the trigger, but nothing happened. When Antonio pulled the trigger a second time, the firearm discharged and T.H. suffered a gunshot wound to the stomach. Antonio placed the firearm on the counter, gathered his belongings, and left. T.H. wiped off blood, changed clothes, and threw the shell casing off the balcony.

¶ 8    M.B. and D.B. returned to the apartment, then went outside with T.H. and met defendant. When T.H. saw defendant, defendant "holler[ed]," asking, " 'Why did you touch the gun.' " T.H. denied touching it, and defendant fell to his knees. Defendant then walked to the apartment, and T.H. was driven to the hospital by M.B.'s friend. During the drive, M.B. instructed T.H. to say that he was shot outside. T.H. initially complied because he did not want his mother to "go away." However, after speaking to his grandmother, he told police what really happened.

¶ 9    During cross-examination, T.H. testified that he saw defendant put the firearm in a shirt while defendant was in M.B.'s room. Later, T.H. was at the door to the bedroom when Antonio looked under the bed; from there, T.H. could see another firearm. They did not remove that firearm from under the bed. Antonio climbed onto the kitchen counter first, then T.H. followed. The firearm in the kitchen was located above the refrigerator cabinet, and was not wrapped in a shirt. When T.H. and his family encountered defendant outside, M.B. and defendant argued and defendant asked why T.H. touched the firearm. Defendant fell to his knees and began crying.

¶ 10    D.B., who was 13 years old at the time of trial, testified that on the morning of April 7, 2015, she and M.B. were in M.B.'s bedroom when defendant entered. T.H. and Antonio were outside the room. Defendant asked M.B. for a firearm and stated that he "was gonna get into it with somebody." M.B. removed a firearm from under the bed, wrapped it in a shirt, handed it to

defendant, and told him to "take it out." Defendant exited the room and went toward the kitchen. D.B. and M.B. then went to the store. On the way back, they encountered Antonio, who stated that T.H. had been shot.

¶ 11    When D.B. and M.B. entered the house, T.H. had a hand on his stomach and was crying. After T.H. lifted his shirt to display a bullet wound, the three left the house and encountered a relative, who spoke with M.B. When defendant arrived, M.B. told him what happened and he yelled at T.H., asking why T.H. played with the firearm. T.H. denied playing with the firearm and said that Antonio had.

¶ 12    During cross-examination, D.B. stated that defendant did not spend the night at the residence the night before the shooting. She later spoke to detectives at her grandmother's home, but did not tell the detectives about the conversation between M.B. and defendant. D.B. did not remember telling the detectives that she saw a firearm that morning and that she, M.B., and defendant left the house together. D.B. then testified that she did not speak to detectives; rather, she was present while they spoke to her grandmother. She later acknowledged telling the detectives that she saw a firearm wrapped in a shirt. At trial, D.B. testified that after M.B. gave defendant the firearm, he went to the kitchen.

¶ 13    M.B. testified that she had a prior conviction for forgery and a firearm-related conviction arising out of this incident. On April 7, 2015, she received a phone call from defendant, who was her boyfriend at that time. Defendant stated that he had "gotten into it" with someone and asked her to retrieve a weapon. M.B. retrieved a firearm from under her bed and wrapped it in T.H.'s shirt. She walked to the backdoor, opened it, and handed the firearm to defendant. Defendant entered the residence. M.B. told defendant to " 'calm down' " and put the firearm away before he

did something "stupid." She asked him to remove the firearm from the house and for money for the store.

¶ 14   After receiving money from defendant, M.B. told T.H. and Antonio to watch television while she went to the store. M.B., D.B., and defendant left the apartment together. M.B. and D.B went to a store where M.B. purchased alcohol, and defendant went his own way. On the way home, M.B. saw Antonio running and yelled his name. Antonio stated that T.H. had been shot. When M.B. returned home, T.H. stated that Antonio mistakenly shot him. After looking at the wound, she thought it was just a "skin mark," and the family walked to the corner to see a family member. There, M.B. saw defendant and stated that T.H. was shot. Defendant yelled and asked T.H. why he touched the firearm. T.H. stated it was Antonio. As the group walked home, the family member stated that the wound was more serious, and M.B. asked a friend to take them to the hospital.

¶ 15   M.B., who was scared, told police that T.H. was injured in a drive-by shooting. While M.B. was at the hospital, defendant called to check on T.H. and stated that he would turn himself into authorities if necessary. At one point, officers removed M.B. from T.H.'s room and asked her to tell the truth, which she eventually did. She did not own or keep firearms in her home.

¶ 16   During cross-examination, M.B. acknowledged that as a person with a felony conviction, she is not supposed to be around firearms. However, she did not know that the firearm was in the house. Defendant did not live with her at that time but sometimes stayed with her, including the night before the shooting. Defendant left early that morning, then called her to state that he was coming for the firearm. When defendant returned, he was angry. She did not remember if defendant had another firearm when he returned. M.B. wrapped the firearm in a shirt and gave it to defendant. Defendant removed the firearm from the shirt, held it, and went "off" about how he "got into it

with somebody." M.B. told him to put the firearm away and not do anything "stupid." She then walked to the bathroom.

¶ 17    M.B. told the police that T.H. was shot outside because she did not want to get into trouble. She knew that she could not possess a firearm because she was a felon and it would result in eviction from the Chicago Housing Authority (CHA) building where she lived. When she went to a police station, she was not advised of her rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). She did not remember telling a detective that when defendant "came back" she observed a firearm "sticking" out of his back pocket. M.B. admitted that she drank alcohol the prior night and that morning. She did not contact the police to ask them to remove the firearm from her home.

¶ 18    Prior to the State's next witness, Chicago police detective Carlton Flagg, defense counsel asked the trial court if he could perfect certain impeachment by cross-examining Flagg during the State's case, rather than recalling Flagg during the defense's case. The State did not object.

¶ 19    Flagg testified that he spoke with T.H. at a hospital and then relocated to T.H.'s home, where he searched the backyard and recovered a .45-caliber shell.

¶ 20    During cross-examination, Flagg acknowledged that a supplemental case report, which summarized the investigation, did not state that T.H. saw defendant walk from the bedroom to the kitchen with a firearm or that T.H. saw a firearm under his mother's bed that day. Flagg spoke with M.B. at a police station after advising her of the *Miranda* rights. M.B. stated that she observed a second firearm "sticking" out of defendant's back pocket when he returned to the apartment and this information was contained in the supplemental case report.

¶ 21    During the jury instruction conference, trial counsel asked whether the State planned to proceed on both AHC counts. The court then asked the State which firearm was the subject of

count I. The State responded that the firearm retrieved from under the bed was the subject of count I. The court then inquired as to the firearm referenced in count II. The State responded that there was testimony that defendant had another firearm on his person, but conceded that there was not "any evidence about that second handgun." The trial court then clarified that the firearm referenced in count II was the firearm allegedly in defendant's pocket when he returned to the apartment, and the State answered in the affirmative.

¶ 22 The court stated that it did not recall "any evidence" of the second firearm, and although there were "questions of that and attempts to impeach with respect to that from defense counsel," no one testified "with any memory recollection that that actually occurred." The court asked the State if it was "missing something" and the State responded by making a motion to nol-pros count II for AHC. The trial court noted that count II was nol-prossed and, after further discussion as to jury instructions, adjourned for the day.[3]

¶ 23 The jury found defendant guilty of count I for AHC. Following a hearing, he was sentenced to 14 years in prison.

---

[3] The record on appeal does not contain the transcript from October 6, 2016, the second day of trial. While an unnotarized affidavit from a court reporter states that she cannot locate the transcript from October 6, 2016, both parties' briefs on appeal cite to the October 6, 2016, report of proceedings. This court's clerk's office has requested that the Office of the State Appellate Defender supplement the record on appeal with this transcript. However, the record has not been supplemented.

Our order on direct appeal, and our review of the parties' briefs, reveal that the second day of trial included the testimony of a Chicago police officer as to defendant's flight and arrest, the admission through a stipulation of defendant's two qualifying convictions for purposes of AHC, and the jury's verdict. This gap in the record has not affected this court's ability to adjudicate the issues in this appeal, because defendant's claims of ineffective assistance relate to trial counsel's failure to object to portions of M.B.'s testimony and counsel's cross-examination of M.B. on the first day of trial. Moreover, defendant, as appellant, bears the burden of presenting a sufficiently complete record of the proceedings to support his claims of error, and any doubts arising from the incompleteness of the record on appeal will be resolved against him. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984).

¶ 24 On direct appeal, we affirmed defendant's conviction and remanded the cause so that defendant could file a motion challenging the fines and fees order in the circuit court. See *People v. Williams*, 2020 IL App (1st) 163417.

¶ 25 On September 7, 2021, defendant's *pro se* postconviction petition was filed in the circuit court alleging that he was denied effective assistance when, relevant here, trial counsel failed to file a pretrial motion to exclude evidence of defendant's other "bad acts" and "recklessly" elicited evidence that defendant possessed a firearm in addition to the one "alleged in the indictment," and appellate counsel failed to raise these issues on direct appeal. The petition did not acknowledge that defendant was charged with possessing two firearms, that the State proceeded to trial on two counts of AHC, and that the State nol-prossed count II for AHC during the jury instruction conference.

¶ 26 On November 29, 2021, the circuit court summarily dismissed the petition as frivolous and patently without merit in a written order.

¶ 27 On appeal, defendant contends that the circuit court erred by summarily dismissing the *pro se* postconviction petition when it established arguable claims of ineffective assistance of trial and appellate counsel. He argues that he was denied effective assistance by trial counsel's failure to ensure that the jury did not hear evidence of his propensity to commit armed violence and his alleged possession of a second firearm. Defendant further asserts that he was denied effective assistance when appellate counsel failed to raise these issues on direct appeal.

¶ 28 The Act provides a three-stage procedural mechanism through which a defendant may assert a substantial denial of his constitutional rights in the proceedings which resulted in his conviction. *People v. Tate*, 2012 IL 112214, ¶¶ 8-9. "The purpose of [a postconviction] proceeding

is to allow inquiry into constitutional issues relating to the conviction or sentence that were not, and could not have been, determined on direct appeal." *People v. Barrow*, 195 Ill. 2d 506, 519 (2001). Thus, issues that could have been raised on direct appeal, but were not, are forfeited. *People v. Blair*, 215 Ill. 2d 427, 443-44 (2005).

¶ 29     At the first stage, the defendant files a petition, which the circuit court independently reviews and, taking the allegations as true, determines whether it is frivolous or is patently without merit. *Tate*, 2012 IL 112214, ¶ 9. A petition should be summarily dismissed as frivolous or patently without merit only when it has no arguable basis in either fact or law. *People v. Hodges*, 234 Ill. 2d 1, 11-12 (2009). A petition lacks an arguable basis in fact or law when it "is based on an indisputably meritless legal theory or a fanciful factual allegation." *Id.* at 16. Fanciful factual allegations are those which are "fantastic or delusional," and an indisputably meritless legal theory is one that is "completely contradicted by the record." *Id.* at 16-17. We review the summary dismissal of a postconviction petition *de novo*. *Id*. at 9.

¶ 30     To determine whether trial counsel was ineffective, we follow the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Hodges*, 234 Ill. 2d at 17. At the first stage of postconviction proceedings, "a petition alleging ineffective assistance may not be summarily dismissed if (i) it is arguable that counsel's performance fell below an objective standard of reasonableness and (ii) it is arguable that the defendant was prejudiced." *Id.*

¶ 31     Both prongs of the *Strickland* test must be satisfied by the defendant for a finding of ineffectiveness. *People v. Veach*, 2017 IL 120649, ¶ 30. Ineffective assistance of counsel claims are generally reviewed *de novo*. *People v. Gunn*, 2020 IL App (1st) 170542, ¶ 91.

¶ 32    Here, defendant's allegations that he was denied the effective assistance of trial counsel are based upon witness testimony and therefore could have been raised on direct appeal. These issues are, therefore, forfeited in this postconviction petition. See, *e.g.*, *People v. Davis*, 2014 IL 115595, ¶ 13 (the Act allows inquiry into constitutional issues arising from the original conviction that were not raised and could not have been adjudicated on direct appeal; issues that could have been raised, but were not, are forfeited). However, defendant attempts to overcome this forfeiture by challenging appellate counsel's failure to challenge trial counsel's effectiveness on direct appeal.

¶ 33    "The *Strickland* standard applies equally to claims of ineffective appellate counsel, and a defendant raising such a claim must show both that appellate counsel's performance was deficient and that, but for counsel's errors, there is a reasonable probability that the appeal would have been successful." *People v. Petrenko*, 237 Ill. 2d 490, 497 (2010). However, appellate counsel is not obligated to argue every conceivable issue on appeal, and a defendant cannot claim prejudice based on appellate counsel's failure to raise a non-meritorious issue. *People v. Pingelton*, 2022 IL 127680, ¶ 64. If the underlying claim would not have succeeded, "then 'there is no arguable legal basis' " for the defendant's claim that he was denied effective assistance of appellate counsel on direct appeal. *People v. Randall*, 2021 IL App (1st) 191194, ¶ 66 (quoting *Petrenko*, 237 Ill. 2d at 501-02).

¶ 34    In order to establish deficient performance under the first prong of the *Strickland* test, a defendant must demonstrate that trial counsel's performance was "objectively unreasonable under prevailing professional norms." (Internal quotation marks omitted.) *Gunn*, 2020 IL App (1st) 170542, ¶ 94. "A defendant is entitled to competent, not perfect, representation, and mistakes in

trial strategy or judgment will not, of themselves, render the representation ineffective." (Internal quotation marks omitted.) *People v. Bell*, 2021 IL App (1st) 190366, ¶ 63.

¶ 35    Under the second prong of the *Strickland* test, a defendant must demonstrate a reasonable probability that, but for counsel's complained-of errors, the result of the proceeding would have been different. *Gunn*, 2020 IL App (1st) 170542, ¶ 96. "When the evidence at trial is 'overwhelming,' a reviewing court will not be 'persuaded that it is reasonably probable that a jury would have acquitted [the] defendant even in the absence' of counsel's alleged errors." *Id.* (quoting *People v. Patterson*, 2014 IL 115102, ¶ 87). "If it is easier to dispose of an ineffective assistance claim on the ground that it lacks sufficient prejudice, then a court may proceed directly to the second prong and need not determine whether counsel's performance was deficient." *People v. Givens*, 237 Ill. 2d 311, 331 (2010).

¶ 36    Defendant first contends that he was denied effective assistance by trial counsel's failure to ensure that the jury did not hear evidence that defendant had the propensity to commit armed violence. He argues there was no strategic reason for counsel not to object to M.B.'s "inflammatory" testimony that defendant had "gotten into it with someone" and asked her to retrieve a firearm from under her bed, and that when defendant arrived at her home upset, she told him to calm down and put the firearm away before he did anything "stupid."

¶ 37    We note, however, that this information had already been presented to the jury through D.B.'s testimony that defendant asked M.B. for the firearm and stated that he "was gonna get into it with somebody." Further, as counsel's theory of the case was that defendant did not possess the firearm and M.B. had motive to blame defendant in order to escape accountability, counsel reasonably chose to attack M.B.'s credibility by questioning her as to her alcohol consumption,

why she told T.H. to lie to the police about the shooting, and the consequences facing M.B., a felon and a CHA resident, if she possessed a firearm.

¶ 38 Moreover, even if we were to agree that counsel's failure to object constituted deficient performance, defendant cannot establish prejudice. Here, three witnesses testified that defendant possessed the firearm that was retrieved from under M.B.'s bed, and that when defendant learned that T.H. had been shot, defendant fell to the ground, cried, and asked T.H. why he played with the firearm. See *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009) ("the testimony of a single witness, if positive and credible, is sufficient to convict"); see also *People v. Sanchez*, 2013 IL App (2d) 120445, ¶ 35 ("Statements or conduct indicating the defendant's consciousness of guilt may serve as circumstantial evidence supporting a conviction.").

¶ 39 Defendant asserts that T.H., D.B., and M.B. were incredible witnesses, noting that the family members initially stated that T.H. was shot outside and gave conflicting testimony as to who retrieved the firearm from under the bed and where defendant took possession of the firearm. All three witnesses, however, testified that defendant possessed the firearm. See *People v. Gray*, 2017 IL 120958, ¶ 47 (contradictory testimony, or inconsistencies in collateral matters, does not render the witness's testimony "as to material questions incredible"). Considering the State's evidence, we are not persuaded that it is reasonably probable that the jury would have acquitted defendant in the absence of counsel's alleged errors. *Gunn*, 2020 IL App (1st) 170542, ¶ 96. Thus, defendant cannot establish that he was arguably prejudiced by trial counsel's failure to object. *Hodges*, 234 Ill. 2d at 17.

¶ 40 Defendant next contends that he was denied effective assistance by trial counsel's elicitation of "damaging" testimony that defendant possessed a firearm in his back pocket. He

asserts that testimony regarding the firearm allegedly in his back pocket "could permit the jury to find him guilty of AHC, "regardless" of whether the jury believed there was sufficient evidence that defendant possessed the firearm from the top of the refrigerator. He argues that there was no reason to attack M.B.'s "credibility" by questioning her as to whether she told police that she observed defendant in possession of a second firearm, and that this testimony "affirmatively harmed" defendant. We disagree.

¶ 41 At the time of trial counsel's complained-of actions, defendant was charged with two counts of AHC based upon the possession of two distinct firearms. The firearm retrieved from under M.B.'s bed and used in the shooting was the subject of count I and the firearm allegedly in defendant's back pocket when he returned to the apartment was the subject of count II. Thus, given that two counts of AHC based upon defendant's possession of two firearms were at issue at this point in the trial, trial counsel challenged the evidence as to defendant's possession of each firearm.

¶ 42 To that end, trial counsel elicited that M.B. did not remember whether defendant possessed another firearm when he returned to the apartment and did not remember telling a police detective that she observed a firearm in defendant's back pocket when he returned to the apartment. Further, challenging the reliability of M.B.'s assertion that defendant returned to the apartment to obtain a firearm that he had left there, trial counsel then asked M.B., "[s]o according to what you don't remember, [defendant] already had a gun but he came back to get a gun, is that right?" To which M.B. again responded that she did not remember. As impeachment of M.B.'s testimony, trial counsel then elicited from Detective Flagg that M.B. stated that defendant possessed a second firearm that stuck out of his back pocket when he returned to the apartment. Counsel's questioning

of M.B. regarding whether she told police that she observed defendant in possession of a second firearm was a reasonable attack on the credibility of her version of events.

¶ 43    Further, defendant cannot establish prejudice from the complained-of conduct. As noted above, M.B. was not the only witness who testified that defendant possessed the firearm removed from under the bed. Both T.H. and D.B. testified defendant possessed that firearm, and we do not find it reasonably probable that the jury would have acquitted defendant in the absence of counsel's alleged errors in questioning M.B. about a firearm in defendant's pocket.

¶ 44    Moreover, at the jury instruction conference, trial counsel asked whether the State planned to proceed on both AHC counts, which led to the trial court questioning the State as to the evidence supporting count II, and the State's ultimate decision to nol-pros that count. In other words, following the jury instruction conference and as a result of trial counsel's questioning of M.B. regarding the firearm in defendant's pocket, defendant faced a possible conviction for one count of AHC rather than two. Defendant therefore cannot establish that he was arguably prejudiced as not only did T.H.'s and D.B.'s testimony establish that defendant possessed the firearm removed from under the bed, trial counsel's complained-of actions resulted in the State nol-prossing AHC count II premised upon his possession of a firearm in his pocket. *Hodges*, 234 Ill. 2d at 17.

¶ 45    As defendant has failed to establish that he was arguably denied the effective assistance of trial counsel, his claim that he was arguably denied effective assistance of appellate counsel on direct appeal for failure to challenge trial counsel's performance similarly fails. See *Pingelton*, 2022 IL 127680, ¶ 64 ("a defendant cannot claim prejudice based on appellate counsel's failure to raise an issue that is not meritorious").

¶ 46 Accordingly, the circuit court properly summarily dismissed defendant's *pro se* postconviction petition when it failed to establish that he was arguably denied the effective assistance of trial and appellate counsel. See *Hodges*, 234 Ill. 2d at 17.

¶ 47 For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 48 Affirmed.